UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIAM GAMBA,

    Plaintiff,  CASE NO.:

-vs-  **JURY TRIAL DEMANDED**

CASE WESTERN RESERVE UNIVERSITY, and
CASE WESTERN RESERVE UNIVERSITY
BOARD OF TRUSTEES

    Defendants
_____/

## COMPLAINT

COMES NOW, the Plaintiff, WILLIAM GAMBA, by and through undersigned counsel, and hereby sues Defendants, CASE WESTERN RESERVE UNIVERSITY and CASE WESTERN RESERVE UNIVERSITY BOARD OF TRUSTEES (collectively referred to as "CWRU") and says as follows:

### THE PARTIES

1.  Plaintiff WILLIAM GAMBA is a natural person, citizen of the United States and citizen of the state of Florida. During the events described herein, Plaintiff was a doctoral student at Case Western Reserve University in its Doctor of Nursing Practice ("DNP") program, and attended classes online while residing in Florida and also travelled to attend programs at the university housing in Cleveland, Ohio.

2.  Defendant Case Western Reserve University (hereafter "CWRU" or "University") is an Ohio corporation and private institution located in Cleveland, Ohio.

3. Upon information and belief, the Case Western Reserve University Board of Trustees ("Board of Trustees") is the governing body of CWRU. Upon information and belief, the Board of Trustees is responsible for setting policy to govern the University.

## JURISDICTION AND VENUE

4. This Court has diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because: (i) Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interest and costs; and (ii) the state law claims are so closely related to the claims over which this Court has original jurisdiction as to form the same case or controversy under Article III of the United States Constitution.

5. This Court has personal jurisdiction over Defendant CWRU on the grounds that it is conducting business within the State of Florida.

6. This Court has personal jurisdiction over Defendant Board of Trustees on the grounds that it is conducting business within the State of Florida as the governing body of CWRU.

7. This Court has jurisdiction over this action pursuant to the Declaratory Judgment Act, §§ 86.011, 86.021, and 86.061, Florida Statutes (2011), as well as the Court's general jurisdiction. In addition, Mr. GAMBA damages exceed Thirty Thousand Dollars ($30,000) based upon a calculation of the losses and damages he incurred as a result of the University's action, including but not limited to (A) tuition for semesters from which the University excluded and suspended him, as well as (B) lost earning that a doctoral graduate could reasonably have expected to receive. Additionally, Section 86.011 of the Declaratory Judgment Act provides that "[a]ny person seeking a declaratory judgment may also demand additional, alternative, coercive, subsequent or supplemental relief in the same action." Fla. Stat. § 86.011(2). Section 86.061 of the Declaratory Judgment Act provides that "[f]urther relief based on a declaratory judgment may be granted when necessary and proper." Fla. Stat. § 86.061. Under the facts as described below,

requiring Plaintiff to institute a separate action at law to assert, among other things, common law claims for breach of contract (express or implied) and unjust enrichment would impose an unnecessary burden on both Plaintiff and the Defendants.

8. Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because CWRU is considered to reside in this judicial district and because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTS

9. Defendant conducts nationwide advertising in an effort to attract potential students to enroll in its doctoral program for the Doctor of Nursing Practice ("DNP") degree, which is offered through Defendant's college of nursing, the Francis Payne Boyle ("FPB") School of Nursing at Case Western Reserve University, by publishing information, including but not limited to printed brochures and online content on its website, emphasizing the availability, accreditation and prestige of the DNP program, as well as the post-graduation career benefits of acquiring the DNP degree at CWRU.

10. Plaintiff's decision to enroll in the DNP at CWRU, and to forego enrollment at other universities offering DNP degree programs, was directly influenced by Defendant's aforementioned publications advertising the program quality and career benefits of the DNP degree offered at CWRU.

11. After enrolling in the DNP program at CWRU, Plaintiff began taking the courses required under the DNP program curriculum and maintained good standing as a student at all material times.

12. Plaintiff timely paid all required tuition to CWRU for enrollment in the DNP program.

13. On or about July 15, 2019, CWRU issued a written notice to Mr. GAMBA informing him that CWRU had imposed the sanction of "University Separation," thereby resulting in the immediate discontinuation of Plaintiff's enrollment at CWRU and his participation in the DNP Program. The written notice from CWRU stated that it was "aware of a civil lawsuit, a state criminal investigation, and a Federal Bureau of Investigation criminal investigation all related to your involvement in the death of Blaise Gamba." The written notice also made reference to allegations from said civil lawsuit, and stated that such allegations, "if true, would violate the Case Western Reserve University Code of Conduct, as well as the American Nurses Association Code of Ethics for Nurses and the Frances Payne Bolton School of Nursing professionalism requirements." The written notice further stated that the University Separation sanction would remain in effect for at least the duration of the civil lawsuit against Plaintiff.

14. Plaintiff had not been informed that CWRU was undertaking any disciplinary action against him or even considering imposing any sanctions against him prior to receiving the July 15, 2019 written notice.

15. None of the procedures for disciplinary action designated in CWRU's student publications were utilized by CWRU or made available to Plaintiff at any time prior to or after CWRU imposed the sanction of University Separation on Plaintiff.

16. At the time CWRU issued the July 15, 2019 written notice to Plaintiff and imposed the sanction of University Separation, Plaintiff had met his contractual obligations for enrollment at CWRU, including but not limited to payment of tuition to CWRU for enrollment in the DNP Program, satisfaction of all academic standards and program requirements for continued enrollment in the DNP program, and compliance with the standards set forth the applicable written codes of conduct and student handbooks published by CWRU.

17. At the time CWRU issued the July 15, 2019 written notice to Plaintiff and imposed the sanction of University Separation, Plaintiff was merely within a few credits of graduating the DNP program and acquiring his DNP degree.

18. On August 1, 2019, Plaintiff's undersigned counsel sent correspondence on Plaintiff's behalf to CWRU via certified mail, formally requesting reconsideration of CWRU's decision to sanction Plaintiff with University Separation forcing the discontinuation of his enrollment in the DNP program and pursuit of his DNP degree, and requesting a Formal Hearing pursuant to Article IV Section C of the CWRU Code of Conduct. *See* Exhibit "A" hereto.

19. The August 1, 2019 letter further explained that the referenced civil lawsuit for wrongful death, and the related law enforcement investigation, following the death of Plaintiff's wife, Blaise Gamba, arose as a result of unfounded allegations by Blaise's mother, Nancy Huhta, in an effort to secure life insurance proceeds made available through Blaise's employer. The letter further explained that Pinellas County law enforcement had conducted a detailed criminal investigation by a panel made up of three detectives, a sergeant, and a corporal, which spent approximately 250 hours analyzing all available forensic evidence to render its conclusion, set forth in its formal report, in which the panel expressly stated:

> "To summarize the review panel's findings, the scientific evidence and physical evidence coupled with testimony from medical professionals, family, friends, experts, and coworkers, the facts of this case ***overwhelmingly*** indicated a crime was ***not*** committed by William Gamba, ***and the death of Blaise Gamba was an accident*** … CASE CLOSED: SOLVED NON-CRIMINAL"

*See* Exhibit "A" at pg. 2.

20. The letter goes on to reiterate that "[t]he only investigation that was performed was conducted by county and state law enforcement officials" which "was formally completed and closed after a conclusive determination of accidental death was issued," and that "the only ongoing

process is the baseless claim for wrongful death initiated by Nancy Huhta merely by paying a filing fee in Circuit Court." *Id*.

21. The letter further states that "[b]y precluding Mr. Gamba from completing the DNP program until disposition of the civil action, [CWRU] is improperly permitting decision-makers to give credence to mere unfounded allegations," and that such action "constitutes an arbitrary, capricious, and a bad faith refusal to permit Mr. Gamba to complete the program in which he has already invested significant time and money." *Id.*

22. The letter concludes by respectfully requesting that CWRU confirm Plaintiff's immediate re-admission to the DNP program by providing written notice to Plaintiff's undersigned counsel on or before 1:00 PM EST on August 12, 2019, and that failing to do so, it is Plaintiff's intention to seek relief in court, including but not limited to money damages. *Id.* at pg. 3.

23. On October 29, 2019, Plaintiff's undersigned counsel sent an email to CWRU administration attaching a copy of the aforementioned August 1, 2019 letter, and noting that Plaintiff had made a request in the letter for a Formal Hearing under Article IV Section C of the Code of Conduct. The email further requested that CWRU advise Plaintiff's undersigned counsel of Plaintiff's available options after reviewing the information with the program administration. *See* Exhibit "B" hereto.

24. To date, CWRU has not responded to either of the above described written communications from Plaintiff's counsel, has not provided Plaintiff with the requested Formal Hearing pursuant to Article IV Section C of the Code of Conduct, and has not lifted the University Separation sanction or allowed Plaintiff to resume his enrollment and complete the curriculum requirements for obtaining his DNP degree.

## CWRU'S POLICIES AND PROCEDURES

### The CWRU Student Code of Conduct

25. The CWRU Student Code of Conduct (hereafter "Code of Conduct" or "Student Code"), which was at all material times in effect, states that its scope applies to the behavioral expectations of all undergraduate, graduate and professional students enrolled at CWRU [excluding academic and sexual misconduct], and provides that all disciplinary actions arising from allegations of behavioral conduct within its scope shall be governed by and conducted in accordance with the written procedures and guidelines set forth in Article IV thereof. *See* Exhibit "C" hereto.

26. Article III of the Code of Conduct, entitled "Proscribed Conduct," defines the scope of its application, and enumerates twenty (20) categories of conduct deemed to violate the Code of Conduct. *Id.*, at pgs. 3-8.

27. Article IV of the Code of Conduct, entitled "Student Conduct Code Procedures," defines, in pertinent part, (1) who may allege and/or be accused of a violation of the Code of Conduct; (2) the factors and procedure for determining the appropriate "resolution path" to be used for a given allegation; (3) the process, procedures and guidelines for each resolution path; and (4) the potential sanctions that may be imposed upon a student found to have violated the Code of Conduct. *Id.*, at pgs. 8-16.

28. Section A(2) of Article IV defines the four (4) potential resolution paths that the university's designee is to consider upon review of an allegation that a student violated the Code of Conduct. Those four resolution paths are as follows:

   (a) **The Administrative Hearing Process**: designated as the appropriate process "when there is no possibility of separation or expulsion from the university being imposed as a sanction."

> (b) **The Formal Hearing Process**: designated as the appropriate process "if there is *any possibility of separation or expulsion* from the university being imposed as a sanction or if the incident had a significant impact to the university community or other individuals."
>
> (c) **Referral of the allegation to a different process**: designated as appropriate where allegations raise "possible violations that fall outside the scope of the Student Code of Conduct."
>
> (d) **Dismissal of the allegation**: designated as the appropriate determination "if the *available information* supports that the incident does not fall within the scope of the Student Code of Conduct or any other policy."

*Id.*, at pg. 8 (emphasis added).

29. The procedures and guidelines for the Formal Hearing Process—which is the specified resolution path to be used where the possibility of separation or expulsion exists—are set forth in Article IV Section C of the Code of Conduct, and provide as follows, in pertinent part:

> (1) That a time shall be set for a formal conduct board hearing at least five business days after the student has been notified of the date, time and location;
>
> (2) That the respondent shall be entitled to review all relevant information at least five days prior to the hearing;
>
> (3) That the hearing shall be conducted according to the guidelines enumerated in Article IV Section C(4), including but not limited to the following, in relevant part:
>
>> a. The hearing board shall consist of three individuals and a non-voting chair;
>>
>> b. The respondent shall have the right to an advisor of the respondent's choice, at his own expense;
>>
>> c. The respondent and his advisor shall have the right to attend the entire proceeding, except for the deliberations;
>>
>> d. The respondent shall have an opportunity to present relevant information;

  e. The respondent shall have the opportunity to ask questions of the University's investigator, the complainant and witnesses;

  f. The hearing board will not deliberate to determine responsibility until all appropriate parties have had an opportunity to present information and ask questions;

  g. The hearing board must first determine the respondent's responsibility for a violation before deliberating to determine sanctions;

  h. The hearing board's determination of responsibility for each violation shall be made on the basis of preponderance of the evidence; and

(4) That the available information regarding the alleged violation shall *only* be presented without the respondent present if *with proper notice* respondent does not appear for a conduct hearing.

  30. The sanctions that may be imposed on a student found to have violated the Code of Conduct are enumerated in Article IV Section G, and include, in relevant part, "University Separation" and "University Expulsion." *Id*. at pgs. 13-15.

  31. "University Separation" is defined as the "[s]eparation of the student from the university for a definite period of time [not to exceed 24 months for a single incident that violates the Code of Conduct]" during which time the separated student is banned from the university campus and "may not enroll in classes or be a part of any university related activities," but "is eligible to petition to return to the university" after the defined period of time. *Id*. at pg. 14 (Article IV Section G(1)(f)).

  32. "University Expulsion" is defined as the "[p]ermanent separation of the student from the university" which includes "[a] ban from the university campus and from participation in

university related activities and events [] unless otherwise specified." *Id*. (Article IV Section G(1)(g)).

### The CWRU School of Graduate Studies Policies and Procedures

33.     The CWRU School of Graduate Studies Policies and Procedures includes a section entitled "Graduate Student Rights and Responsibilities" which states as follows, in relevant part:

> It is the responsibility of the student to become familiar with the general rules and regulations of the University, not just those of the School of Graduate Studies. These are including but not limited to the University Policies and University Code of Conduct. A member of the University community who is accused of violating any of these rules and regulations is subject to University disciplinary action. **Due process procedures of adequate notice of all charges and a fair hearing will apply**. … The policies and procedures governing all [non-academic] infractions are detailed in the University's Case Student [Code of Conduct].[1]

### The FPB Student Handbook and DNP Program Supplement

34.     In addition to the above described Student Code of Conduct and School of Graduate Studies Polices and Procedures, CWRU publishes a student handbook for students enrolled in programs within the FPB School of Nursing, entitled "FPB Student Handbook," as well as a program-specific supplement for students in the DNP program, entitled "FPB Student Handbook DNP Program Supplement."

35.     The FPB Student Handbook states, in pertinent part, that the CWRU "Student code of conduct policies apply to all students at CWRU," and provides a link to the University webpage where the University Policies and Code of Conduct can be found.

36.     Included in the University Policies and accompanying Statement of Ethics are the following passages:

> All university students enrolled at CWRU are expected to become familiar with these policies and procedures. We have a right to exercise disciplinary action in cases where students violate the law or the university code of conduct.

---

[1] *See* https://case.edu/gradstudies/about-school/policies-procedures (last accessed May 14, 2021) (emphasis added).

. . .

> The university being a human community is subject to human failings, ambiguities and errors. **It is therefore the responsibility of the bodies regulating the affairs of faculty, students, and staff to maintain processes for judging and resolving instances where these principles may have been violated**. However, all such systems depend for their effectiveness, in turn, on the acceptance of common norms of contact -- the ties of trust which bind the university community together.[2]

37.     The FPB Student Handbook further states that allegations of Standards of Conduct violations are specifically subject to the applicable University processes set forth in the Student Code of Conduct, and provides a link to the University webpage where the Code of Conduct is maintained.

38.     The FPB Student Handbook DNP Supplement, in the section entitled "DNP Program – Overview," recites the CWRU Graduate Student Rights and Responsibilities, including the following statement:

> A member of the University community who is accused of violating any of these rules and regulations is subject to University disciplinary action. **Due process procedures of adequate notice of all charges and a fair hearing will apply**. … The policies and procedures governing all [non-academic] infractions are detailed in the University's Case Student [Code of Conduct].

39.     The DNP Supplement also includes a section that identifies the applicable code of conduct, professional standards, and procedures for alleged misconduct that apply to students in the DNP program. The list consists of the CWRU Code of Conduct, the CWRU School of Graduate Studies Policies and Procedures, the FPB Student Handbook, the ANA Scope and Standards of Practice for Nursing and specialties, and the Board of Nursing for the practitioner's given state.

40.     More than a year has passed since CWRU imposed the sanction of University Separation on Plaintiff, who was within merely a few credits of graduation in the DNP program when the sanction was imposed, without first affording him any of the rights and procedures

---

[2] *See* https://case.edu/studentlife/university-policies (last accessed May 14, 2021) (emphasis added).

required under the above described written materials published by CWRU, and without affording him any of said rights and procedures since that time, in effect *perpe* excluding and summarily suspending Plaintiff without cause.

41.By imposing the sanction of University Separation based on allegations in the aforementioned civil lawsuit of criminal wrongdoing by Plaintiff, CWRU was accusing Plaintiff of an infraction under Article III Section B(9) (Violation of any federal, state or local law) of the Code of Conduct.

42.Because Plaintiff was being accused of conduct proscribed under Article III Section B(9) of the Code of Conduct, Plaintiff was entitled to the rights and procedures designated in Article IV of the Code of Conduct, including the Formal Hearing Process under Article IV Section C, to determine by a preponderance of the evidence whether Plaintiff was responsible for a violation of the Code of Conduct, prior to any sanctions being imposed.

43.Plaintiff has committed no violations of the CWRU Code of Conduct, and no evidence whatsoever existed to support a finding by preponderance of the evidence that Plaintiff had committed a violation at the time CWRU imposed the sanction of University Separation, nor does any such evidence exist to this day.

44.CWRU's decision to impose the sanction of University Separation on Plaintiff, thereby terminating Plaintiff's pursuit of his DNP degree in perpetuity, without affording him the rights and procedures designated in the above described written materials published by CWRU, including "due process procedures of adequate notice of all charges and a fair hearing" to be conducted according to the guidelines specified in Article IV Section C, and without any evidence to support a finding that a Plaintiff had committed a violation of the Code of Conduct, was arbitrary and capricious, and committed in bad faith.

45. Plaintiff has been damaged by CWRU's conduct in imposing the sanction of University Separation on Plaintiff without cause and without affording Plaintiff the benefit of the rights and procedures to which he is entitled, including but not limited to the loss of money spent on tuition paid to CWRU, loss of past earnings for the time Plaintiff has been unable to appreciate the benefits of the DNP degree he would have earned but for CWRU's actions, and loss of future earnings resulting from Plaintiff's inability to obtain the career benefits he would have experienced with the DNP degree he would have earned but for CWRU's actions.

46. All conditions precedent to this action have been satisfied by Plaintiff or have otherwise been waived by Defendant.

## COUNT I

### (Breach of Implied-In-Fact Contract)

47. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs (1) through (46), as if fully set forth herein.

48. Under Florida law, the relationship between a student and a private university is contractual in nature.

49. Under Florida law, the publications of a private university at the time of a student's enrollment are terms of an implied-in-fact contract between the student and the private university.

50. At all material times, a valid contract existed between Plaintiff and Defendant CWRU, wherein CWRU offered Plaintiff the opportunity to enroll in its DNP program that was designed to lead to a DNP degree being conferred upon Plaintiff upon the program's successful completion, in exchange for consideration by Plaintiff in the form of tuition payment and adherence to CWRU's designated policies, procedures and codes, and wherein Plaintiff accepted CWRU's offer by paying tuition to CWRU and complying with CWRU's designated policies,

procedures and codes as consideration for enrollment in the CWRU doctoral program to earn his DNP degree.

51. The terms of the implied-in-fact contract between Plaintiff and Defendant were inferred from the policies, procedures and codes stated in CWRU's aforementioned written publications, including the CWRU Code of Conduct, the CWRU School of Graduate Studies Policies and Procedures, the FPB Student Handbook, and the FPB Student Handbook DNP Supplement, as described herein.

52. Specifically, CWRU's statement in the above described publications that "[d]ue process procedures of adequate notice of all charges and a fair hearing will apply" in the event a student becomes subject to disciplinary action by CWRU, is a term of the implied-in-fact contract between Plaintiff and Defendant.

53. Additionally, the procedures and guidelines set forth in Article IV of the Code of Conduct, and specifically with respect to the Formal Hearing Process under Section C thereof, are terms of the implied-in-fact contract between Plaintiff and Defendant.

54. Defendant CWRU's actions, by imposing the sanction of University Separation on Plaintiff, thereby perpetually excluding and summarily suspending Plaintiff from enrollment and completion of the DNP program and the acquisition of his DNP degree, without factual or legal grounds, and without providing him with "due process procedures of adequate notice of all charges and a fair hearing" and the panoply of rights afforded to him by CWRU's aforementioned written publications, were arbitrary, capricious, performed in bad faith, and constitute a material breach of the implied-in-fact contract.

55. As a direct and proximate result of Defendant's breach of the implied-in-fact contract, Plaintiff has suffered injury and damages.

WHEREFORE, Plaintiff WILLIAM GAMBA respectfully demands judgment against Defendant CWRU for compensatory damages, costs, interest, and such other relief as this Court deems just and proper.

## COUNT II

### (Unjust Enrichment)

56. Plaintiff re-alleges and incorporates by reference the allegations of paragraphs (1) through (46), as if fully set forth herein.

57. Plaintiff has conferred a benefit on Defendant in the form of tuition paid to CWRU for semesters that he was enrolled in the DNP program which CWRU has precluded him from completing, and tuition for semesters that CWRU has excluded and suspended him from attending and completing, and Defendant has knowledge of the benefit it received.

58. Defendant voluntarily accepted and retained the benefit conferred upon it by Plaintiff.

59. Plaintiff received no consideration for the retention of the benefit by Defendant.

60. The circumstances as described herein are such that it would be inequitable for Defendant to retain the benefit conferred upon it without paying the value thereof to Plaintiff.

61. Defendant will be unjustly enriched if it is allowed to retain the aforementioned benefit, and Plaintiff is entitled to recover the amount by which Defendant was unjustly enriched at Plaintiff's expense.

WHEREFORE, Plaintiff WILIAM GAMBA respectfully demands judgment against Defendant CWRU for compensatory damages, costs, interest, and such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury to the extent authorized by law.

                                **MANEY | GORDON**

/s/ *David P. Mitchell*
DAVID P. MITCHELL, ESQUIRE
Florida Bar Number: 067249
JEFFREY "JACK" GORDON, ESQUIRE
Florida Bar Number: 836760
MANEY | GORDON TRIAL LAWYERS
101 East Kennedy Boulevard; Suite 1700
Tampa, Florida 33602
Telephone: (813) 221-1366
Jack@maneygordon.com
d.mitchell@maneygordon.com
a.luke@maneygordon.com
Counsel for the Plaintiff